**HEWLETT–PACKARD COMPANY, Plaintiff,**

v.

**BAUSCH & LOMB INCORPORATED, Defendant.**

**No. C–86–20406 RPA.**

United States District Court, N.D. California.

Sept. 13, 1989.

S. Leslie Misrock, Jonathan A. Marshall, Pennie & Edmonds, New York City, James P. Kleinberg, McCutchen, Doyle, Brown & Enersen, San Jose, Cal., and William H. MacAllister, Hewlett–Packard Co., Boise, Idaho, for plaintiff.

Laurence H. Pretty, Gary A. Clark, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., John M. Ottoboni, Anne L. Enea, Ferrari, Alvarez, Olsen & Ottoboni, San Jose, Cal., James W. Colbert, III, Holly E. Kendig, Richard W. Buckner, O'Melveny & Myers, Los Angeles, Cal., and Bernard D. Bogdon, Bausch & Lomb Inc., Rochester, N.Y., for defendant.

## FIRST CORRECTED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER THEREON

AGUILAR, District Judge.

### I. INTRODUCTION

Plaintiff Hewlett–Packard Company ("HP") claims defendant Bausch & Lomb ("B & L") infringed United States Patent No. 4,384,298 issued to Lawrence LaBarre *et al.* (the "LaBarre patent"). H–P is the owner, by assignment, of the LaBarre patent. In its counterclaim, B & L asserts the invalidity of the patent as obvious from prior art and further asserts that the inventor failed to disclose the best mode of carrying out his invention.[1]

After a six-week court trial, the parties submitted trial briefs and proposed findings of fact and conclusions of law. The Court has carefully reviewed the transcripts, its own copious notes and the parties' submissions. As discussed below, the Court finds the LaBarre patent to be valid and infringed.

---

1. This case is related to *Hewlett Packard Co. v. Bausch & Lomb,* No. C 84–20642. On appeal, the Federal Circuit affirmed this Court's grant of summary judgment. The Circuit remanded that case for further findings on the issue of inequitable conduct in the prosecution of the Yeiser reissue patent. The order of remand on that case does not in any way affect the patent at issue here. In addition, the Circuit affirmed this Court's Order denying B & L's motion to disqualify. *See Hewlett–Packard Co. v. Bausch & Lomb,* 882 F.2d 1556 (Fed.Cir.1989).

## II. FINDINGS OF FACT

### (A) *The LaBarre Invention*

The LaBarre patent covers an x-y plotter which moves paper back and forth through the use of a grit wheel. The grit indents the paper on the first pass. As the paper is moved back and forth, these indentations mate with the rough surface of the drive wheel. This gearing effect minimizes slippage of the paper. *HP Exhibit 1* (LaBarre Patent).

In the 1970's, prior to the LaBarre invention, HP made X–Y plotters of a "moving gantry" type, in which the paper remained stationary on a flat bed and a gantry or beam was driven along the bed above the paper in the X-direction. The marking pen was mounted in a carriage which traveled back and forth along the gantry across the paper in the Y-direction. *TR. Vol 8–1231* (testimony of Lawrence J. LaBarre). Although the moving gantry plotter was accurate, it was slow.

Bill Hewlett assigned Lawrence LaBarre, an engineer at HP Labs in Palo Alto, California, the task of designing a plotter to overcome the complications and speed limitations inherent in the gantry plotter. After unsuccessfully experimenting with, among other things, a planchette that rolled around a stationary piece of paper, Mr. LaBarre began exploring ways of moving the paper, instead of the pen. Towards this end, he built a pocket plotter with pinch rollers. The power rollers were rubber coated to increase the friction, and hence accuracy, in the paper drive. Although the pocket plotters worked to move the paper, the plotter could not retrace a line in both directions. *TR. Vol. 16–2529* (LaBarre); *Plaintiffs' Exhibit 171* (LaBarre's notebook). Apparently, the varying compression of the rubber rolls hampered the plotter's ability to achieve accurate registration. Eventually, the idea of using rubber wheels was discarded as imperfect. Instead, LaBarre considered knurling metal rolls, spiraling sandpaper on the outside of them with the grit out, or impregnating epoxy coated wheels with grit particles. *TR. Vol. 16–2534* (LaBarre).

Charles Tyler, Mr. LaBarre's boss, had suggested knurling the top roller. Based on his experience with knurling, Mr. LaBarre did not think much of this idea and instead began working on the use of grit wheels. Mr. LaBarre decided to make grit drive rollers by coating rollers with quick setting epoxy adhesive and then rolling them in carborundum powder. Using the materials available at his work station, he had some rollers made up this way the same day. On the following day, November 19, 1975, Mr. LaBarre tested the rollers with the directly adhered grit. In 40 passes across the paper, the cumulative error was less than .003 inches. Inspired, he wrote in his diary, "They work 'Eureka'." *TR. Vol. 8–1257 and Vol. 16–2541–42* (LaBarre); *HP Ex. 171* (LaBarre notebook).

Although Mr. LaBarre did not consider the manner in which he created the wheels to be the best method of applying the grit, he knew they were on the right track. Mr. LaBarre believed that the made up grit wheels were not as accurate as expected because some of the grit kernels were insecurely mounted in the epoxy, or lying on their sides. Mr. LaBarre made two other grit wheels by wrapping sandpaper around the wheel. The use of sandpaper was desirable because the grit was already securely attached by the sandpaper manufacturer. *TR. Vol. 8–1263* (LaBarre). During the entire time that LaBarre experimented with the design of the grit drive wheel plotter, he never had any trouble with the sandpaper, it never cracked in the process, and it performed satisfactorily at all times. *TR. Vol. 8–1267* (LaBarre). Indeed, LaBarre testified that the sandpaper gave a better grip than the impregnated epoxy rolls and performed perfect and superior to the directly applied grit wheels. *TR. Vol. 16–2550–52* (LaBarre).

On 11–9–76 LaBarre wrote in his notebook, "# 3 has the old power roll where we rolled in grit on epoxy coating and it won't drive good anymore." *HP Ex. 171, H12465* "# 3" was the plotter Mr. LaBarre had made with the directly adhered grit. Mr. LaBarre testified that he gave up on the directly adhered grit because he never found a method for securing the kernels to

the epoxy. He explained that the directly adhered grit was the first method used because he had the materials immediately available at his desk. "After I found that the rolled on sandpaper worked as successfully as it did, I certainly didn't want to go back to that method." *TR. Vol. 16–2558* (LaBarre).

### (B) *H–P's Commercial Grit Wheel Plotters*

Once LaBarre refined his invention, the next step at HP Labs was to transfer the technology to a manufacturing division interested in exploiting it commercially. Both the Andover, Massachusetts and the San Diego, California divisions adapted Mr. LaBarre's grit wheel invention for use in an electrocardiograph and an X–Y plotter, respectively.

The electrocardiograph manufactured and commercially sold by the Andover Division used sandpaper-covered drive wheels. Martin Mason, an engineer employed by HP's Andover Division, had visited H–P Labs in Palo Alto to familiarize himself with the new paper moving technology. *TR. Vol. 16–2460.* In October 1981, Mason co-authored an article appearing in the *HP Journal* detailing the development of the electrocardiograph. The article explained the benefits of using sandpaper-covered drive wheels versus those having directly-adhered grit particles. The article concluded that sandpaper-covered drive wheels provided the most reliable method for moving paper bi-directionally. *TR. Vol. 2470–79* (Mason). The electrocardiograph which used sandpaper wheels was commercially introduced in 1981.

The San Diego Division chose to use directly adhered grit wheels in its X–Y plotter. The technology for grit drive wheels was first transferred to San Diego when Mr. LaBarre visited the facility in 1975. He took with him a pocket plotter with sandpaper wheels to demonstrate his grit wheel system. Later, based on the X–Y plotter project (the BERTHA project) at San Diego, Mr. LaBarre had a table top version of his plotter sent to the San Diego facility. *TR. Vol. 8–1271–1278* (LaBarre).

In late 1977–early 1978, Terry Flower and Marv Patterson, engineers at HP's San Diego Division, visited HP Labs. The plotter LaBarre demonstrated to Flower and Patterson used sandpaper-covered drive wheels. *TR. Vol. 9–1357* (Flower) Mr. Flower was assigned to develop a grit wheel drive for San Diego's ongoing X–Y plotter project. Mr. Flower found that the sandpaper wrapped grit wheels had problems with cracking and creasing. In addition, Mr. Flower was concerned that the grit particles on the sandpaper would not remain in their adhesive matrix in the production process. *TR. Vol. 9–1371–72* (Flower).

Mr. Kaplan, who took over for Mr. Flower, also visited H–P Labs in 1978 or 1979. Kaplan testified that although he met Mr. LaBarre during his visit, he did not discuss grit wheel technology with him. Mr. Kaplan never corresponded or exchanged information on the grit wheels used in the BERTHA project with Mr. LaBarre. *TR. Vol. 8–1214–15* (Kaplan). Because of the problems encountered with sandpaper wrapped grit wheels, the X–Y plotter was manufactured with grit directly affixed to an epoxy coated wheel. Mr. Kaplan co-authored an article outlining San Diego's development of its commercial drive system and expressing the preference for directly-adhered grit particles, in contrast to the Mason article. *B & L Ex. 77* Mr. Kaplan also executed an H–P Invention Disclosure Form on an "Improved Grit Wheel for Graphics Devices" describing the grit wheel technique devised by himself and George Lynch. *TR. Vol. 8–1208* (Kaplan). HP publicly announced the commercial X–Y plotter using directly adhered grit wheel technology on January 8, 1981.

### (C) *The Claims–In–Suit*

HP did not file its patent application on the LaBarre invention until October 24, 1980. *B & L Ex. 15* (Patent application). Claims 1 and 3 of the LaBarre patent are at issue in this case. HP has stipulated that if claim 1 should be held invalid, claim 3 should be invalid.

Claim 1 of the LaBarre patent is as follows:

1.  An X–Y plotter system for forming images on a web comprising:

first means being coupled to at least one edge of said web for imparting motion thereto to provide a first degree of motion during plotting onto said web in response to a first applied signal;

second means for forming selected visual images on said web and being movable to provide a second degree of motion in response to a second applied signal; and

third means responsive to a third applied signal for imparting motion to said second means;

said first means including first drive means having at least one powered drive wheel contacting the web, and an idler wheel opposite to each of said drive wheels to form a pinch roller assembly with the web between the drive and the idler wheels, one of said at least one drive and idler wheels having a rough surface, and said drive and idler wheels additionally being spring biased together to cause the rough surface to make a series of indentations along the driven edge of the web to minimize slippage with these indentations repeatably mating with the rough surface of the drive wheel as the web is driven back and forth, wherein the rough surface on one of said at least one powered drive and idler wheels of the first drive means has a random pattern, size and height of rough spots.

*HP Ex. 1, col. 13, lines 35–63.*

The specifications set forth a model plotter using sandpaper-covered drive wheels. The invention is further described: "The rough surface of the paper drive roller 30 produces a series of impressions in the edge 15 of paper 11 which acts as an exact mate with the rough surface of roller 30 and acts as a pair of mating gears would, minimizing the slippage of paper 11.... Through numerous experiments, it was determined that number 80 to 120 carborundum paper bonded to paper drive roller 30 provides good results at paper 11 transport

speeds ..." *HP Ex. 1, col. 5, lines 4–18,* (LaBarre patent). This is the only description of the grit constituting rough surface of the drive wheel provided in the LaBarre patent.

(D) *LaBarre's Best Mode*

Obviously, the different divisions of Hewlett–Packard had come up with opposing versions of what was the best mode for manufacturing grit drive wheels. At trial, Mr. LaBarre was subjected to extensive questioning on what he knew about the different commercial adaptations of his invention and his opinion as to the best mode for practicing his invention.

When asked the direct question, "what in your opinion is the best way to make a rough-surface drive wheel for an X–Y plotter ...?," his answer was clear and direct: "That would be ... just as I had done, Sir: taking a metal roll and coating it with fast-setting epoxy and rolling a strip of sandpaper around it, taper-cut joint, and with the grit kernel out...."

At trial, portions of Mr. LaBarre's deposition were read into the record. At his deposition, Mr. LaBarre had testified that he knew that H–P was producing the X–Y plotter using kernels embedded in epoxy. He also stated that he thought the San Diego division used directly applied grit because they "got a more economical process and a better process of applying them." At trial he testified that the deposition testimony did not refer to any date, and he didn't know what time frame B & L was referring to, nor did he really know when he first learned of the use of directly adhered grit. *TR. Vol. 8–1269* (LaBarre). After further questioning and reading of the deposition testimony, the following colloquy occurred.

Q.  Now you had learned by 1978, hadn't you, that Hewlett–Packard had discovered this more economical method of making the grit rolls; is that right?

A.  I think so.

*TR. Vol. 8–1270* (LaBarre).

Mr. LaBarre subsequently disavowed his testimony regarding his early knowledge of San Diego's determination that the better

construction was directly-adhered grit wheels. Mr. LaBarre explained that engineers at HP Labs assumed that HP's manufacturing divisions would develop more economical manufacturing methods after they obtained the technology originated at HP Labs. He further stated that 1) he was unaware of H–P's decision to use directly-adhered grit wheels until he saw a commercial plotter in 1982 or 1983 and 2) that he still believes that a sandpaper-wrapped wheel is a better mode.

The Court has directly observed Mr. LaBarre through several days of testimony, in both direct and cross-examination. The Court finds that Mr. LaBarre was telling the truth when he testified that he believed in 1982, and still believes, that sandpaper wrapped wheels was the best mode for practicing his invention. The Court finds that LaBarre did not know that the San Diego division was using directly adhered grit until after he had applied for his patent. After observing his demeanor and responses to B & L's questioning on the deposition testimony, the Court finds that the deposition testimony must be interpreted to mean that he NOW knows or believes the San Diego method to be better and more economical.

Throughout his testimony, Mr. LaBarre consistently expressed his own belief that the sandpaper covered wheels performed superior than the directly adhered grit wheels.

### (E) *Prior Art Teachings Of The Yeiser Patent*

■ As prior art, B & L principally relies on U.S. Patent No. 3, 761, 950 for "X–Y Plotter" issued on September 25, 1973 to John O. Yeiser ("Yeiser Plotter or Patent"). *B & L Ex. 3* (Yeiser patent). The Yeiser '950 patent discloses an X–Y plotter on which a cut chart is moved back and forth in a longitudinal direction beneath a stationary guide carrying a pen carriage by pinch roller assemblies gripping the chart along its longitudinal edges. The pinch roller assemblies disclosed in Yeiser's specification and shown in his drawings include drive rollers 16 having a diamond knurled

surface and pinch rollers 15. The patent states that, "When the pinch rollers 15, 15a are pressed down against the chart 4, rotation of the drive rollers 16 will move the chart in the Y–direction, as indicated by the double-headed arrow Y in Fig. 2." *B & L Ex. 3, col. 3, lines 43–48.* The drive wheels for moving paper are made of rubber or metal; and can be smooth or knurled. *B & L Ex. 3, col. 3, lines 31–33* (Yeiser patent).

HP distinguishes the LaBarre patent from the Yeiser patent in three interrelated ways: First, the Yeiser patent does not disclose the use of springs to apply pressure. Second, the Yeiser plotter is allegedly a friction drive system, while the LaBarre plotter is positive drive. Third, the Yeiser plotter uses knurled wheels or rubber wheels, while the LaBarre plotter requires the use of a random pattern of rough spots.

#### 1. *Spring Rollers*

The Yeiser patent does not illustrate springs connecting the pinch and drive rollers together. B & L argues that before 1979, it was known that there had to be pressure, biasing or springs, exerted to keep the chart in line. B & L points to the fact that the Yeiser patent recites that the pinch rollers "are pressed down against the chart" so that "rotation of the drive rollers 16 will move the chart in the y-direction...." *B & L Ex. 3, col. 3, lines 43–47* (Yeiser patent).

Mr. Maurice Holmes, called by B & L as an expert in the field of paper handling design and technology, testified that it was common knowledge that to press holes into the media one had to apply normal pressure. However, on cross-examination, Mr. Holmes could not point to a single document setting forth this common knowledge. The first time it was set forth was in 1982 in the LaBarre patent. *TR. Vol. 11–1581* (Holmes' testimony).

William A. Lloyd, called by HP as an expert in paper moving, testified on cross-examination that it was conventional to design pinch wheels using a spring to force the idler wheel towards the knurled wheel. He further stated that although this was known before 1979, "what wasn't known

before LaBarre was the degree of force needed and the penetration of the LaBarre grit." *TR. Vol. 15–2330* (Lloyd's testimony).

A Laboratory Data Control (LDC) X–Y plotter designed by Mr. Yeiser was capable of providing forces on the pinch wheels measured only in grams. *TR. Vol. 15–2290* (Lloyd). B & L suggests that the machines obtained by HP were manufactured prior to 1972, before the slippage problems had been resolved by Milton Roy, the Company that acquired LDC. However, inasmuch as the slippage problems occurred in machines designed according to Yeiser, the LDC plotter also suggests Yeiser did not teach the inherent use of springs. The Court also notes that the LDC machine was tested at the force illustrated in the patent—approximately 19 grams—and at forces 10 times that amount. *TR. Vol. 14–2250.*

The Court finds that the absence of a disclosure of spring rolls and lack of any mention of the force to use in the plotter is a material and essential difference from the LaBarre patent.

### 2. *Positive Versus Friction Paper Drives*

The difference manifests itself in the distinction drawn between a friction drive and a positive drive paper feeder. The Yeiser patent contemplates a friction drive system. The patent describes the plotter as having chart rollers which "may be knurled or otherwise provided with an anti-slip surface; its upper rim is approximately tangent to the table top. These chart driving rollers frictionally engage the bottom surface of the chart near its edges." *B & L Ex. 3 col. 1, line 52–56.*

The use of friction to move paper has been of common knowledge since the turn of the century. A 1908 publication of *Industrial Electrical Measuring Instruments* described the two distinct methods for moving paper known at that time:

the chart is gradually drawn through the recorder, by means, either of a sprocket-

wheel engaging in holes along one edge of the chart ... or by friction rollers driven in the same way.

*H–P Ex. 52–148.*

The distinction between positive drive systems, such as sprockets, and friction drive systems, such as rubber or knurled wheels is maintained today. *TR. Vol. 14–2109–12* (Lloyd). Mr. Lloyd, HP's expert, distinguished the two systems by whether or not the drive surface penetrated or engaged the paper. Frictional drives do not penetrate the substrates of the media.[2] *TR. Vol. 14–2112.* The use of pre-formed holes engaging sprockets which move the paper is a common type of positive drive system. Mr. Lloyd also described positive drives using teeth or pins. *Id. 2112–2120.* In a positive drive system, the holes or perforations positively mate with the teeth, sprockets or pins acting as the gears. The evidence submitted at trial indicates a conceptual separation of friction and positive drive systems.

The LaBarre patent is essentially a positive drive system. The patent teaches the use a random, rough surfaced drive wheel to create indentations in the paper which would then repeatedly mate with the protrusions in the drive wheel.

B & L suggests that inherent in the Yeiser patent is the teaching of repeatably mating indentations similar to LaBarre. However, the absence of any mention of the force necessary to drive the rollers indicates Yeiser was not concerned with creating indentations in the webbing. Reviewing the evidence and the Yeiser patent, the inference the Court draws from the absence of a specification of springs, or the force necessary to drive the paper, is that Yeiser did not contemplate anything other than a friction drive system. The '950 patent does not teach a positive drive system. In addition, using rubber or knurls for the drive wheels is disclosed in prior art with respect to moving paper in strip chart recorders and X–Y recorders. Indeed, rub-

---

2. HP, through Mr. Lloyd, also spent a considerable amount of time arguing a distinction between anti-slip and non-slip. This semantic distinction merely describes the optimum performance of the machines and is irrelevant to the issues at hand. Indeed, the LaBarre patent itself speaks in terms of minimizing slippage not eliminating it.

ber and knurls are classic driving wheels in friction drive systems. *TR. Vol. 14–2250* (Lloyd). The Court finds that Yeiser does not disclose the indentation making and mating means which LaBarre teaches to obtain his gearing effect.

This finding is supported by Mr. Lloyd's experiments with the LDC plotter which was built under Yeiser's direction and supervision. The plotter did not mark a sheet of paper which had been run back and forth through driver rolls. To identify where the knurls contacted the paper, Mr. Lloyd coated the surface of the drive wheels with carbon. At 200 grams of force applied to the pinch roller, photographs taken of the paper do not show any penetration into the paper. The photographs also show the broadening of the impressions left by the carbon which indicates the lack of registration as the paper moved back and forth. *TR. Vol. 15–2293–2300* (Lloyd); *H–P Ex. 411–60–64.*

B & L notes that Lloyd testified that the springs were so weak on the LDC plotters that "a person skilled in the art should have known to apply additional pressure...." *TR. Vol. 15–2278* (Lloyd). Nevertheless, the Yeiser patent itself does not teach the exertion of a sufficient force to drive the paper. In addition, following the description in the patent, of a plotter using friction to drive the chart, a knowledgeable person would likely strengthen the springs so as to accomplish the friction drive of the paper, and not the indentations described in LaBarre. Since the indentation or perforation of the paper is never mentioned in Yeiser, it would not be obvious to exert sufficient force to create such indentations. *See TR. Vol. 10–1490* (Holmes). B & L's expert Holmes could not identify anything in the prior art which taught LaBarre's invention for making indentations in paper by the use of normal force on pinch wheels to obtain repeatability during paper movement. *TR. Vol. 11–1587–88* (Holmes).

B & L demonstrated Houston Instrument's DMP–40 to illustrate the indentations into paper caused by knurled wheels operating under pressure exerted by pinch rollers subject to "conventional forces." The DMP–40 was developed independently of the Yeiser patent so it is not a reconstruction machine, nor was it asserted to be prior art. In addition, there was a suggestion that the DMP–40 was copied from an HP device made in accordance with the LaBarre patent. Although the Court admitted the demonstration into evidence, it did not give the demonstration any weight since the DMP–40 could have learned from LaBarre that gearing will occur when sufficient force is placed on the drive wheel and indentations are made in the paper.

The Court adheres to the description of the LaBarre plotter as a positive drive system. The making of indentations and the gearing effect which produces accuracy and repeatability in an X–Y plotter is a patentable difference over the prior art of the Yeiser patent.

3. *The Difference Between A Roughened Drive Surface And Knurled Wheels*

B & L contends that a knurled wheel, exerting sufficient force on the paper, produces the same result as the random rough spots described in the LaBarre patent. Knurling of the drive wheel, B & L argues, was disclosed in the Yeiser patent and accordingly, LaBarre did not advance any patentable difference over the prior art.

Knurling is a process for rearranging the metal on the surface of a bar or wheel to form patterns to increase friction. This is accomplished by pressing a knurling tool with very strong force against the bar or wheel as it rotates to displace the metal without removing it. Accordingly, knurled surfaces tend to be relatively soft, *TR. Vol. 14–2137* (Lloyd), and not sharp. *TR. Vol. 9–1312* (LaBarre).

LaBarre's invention uses grit particles, rather than metal surfaces, to grab and drive the paper forward. Mr. Lloyd attributed the step forward in the art which LaBarre's invention provided over Yeiser's knurled wheel plotter to the use of grit particles. The grit provided rough spots that were sharper, harder and longer wearing than could be achieved by knurling metal. *TR. Vol. 15–2401, 2451–52* (Lloyd). The hardness of grit and its ability to stay

sharp without wearing down were the important qualities of LaBarre's device compared to knurled metal. *TR. Vol. 17–2694* (LaBarre).

B & L contends that the Court need not reach the question of whether the use of grit particles sufficiently differentiates the LaBarre invention because no limitation requiring the use of grit is found in claim 1. However, even B & L's expert conceded that the specification setting forth the use of sandpaper would be read into the claim limitations because the LaBarre patent was a means plus function patent. *See* 35 U.S.C. § 112; *TR. Vol. 13–1975* (testimony of Raphael V. Lupo). The Court also received testimony that sandpaper consisted of grit adhered to a paper backing. The use of grit to make the indentations necessary to create the gearing system disclosed in LaBarre is a patentable difference over the prior art of Yeiser.

In addition, grit is merely an embodiment of the limitation set forth in claim one: "wherein the rough surface on one of said wheels ... has a random pattern, size and height of rough spots." *HP Ex. 1 col. 13, line 60–63* (LaBarre).

In summary, the Court finds that the LaBarre patent—disclosing a method of applying sufficient pressure on roughened drive wheels so as to cause indentations in paper which repeatedly mate with the rough spots on the drive wheels—to be a patentable difference over Yeiser. The significant advance of LaBarre is the teaching of a positive drive system whereby the indentations in the paper repeatedly mate with the drive roller. This gearing effect is the advance which produces the accuracy and repeatability required in X–Y plotters and as demonstrated in Court. Indeed, the significance of this change in the plotter drive system was recognized by the examiner in his Notice Of Allowance, which noted that "The Title has been changed to 'Plotter with Indentation Making and Mating Means.'" The use of sufficient spring biasing and gritted rolls to create those indentations are interrelated and complementary differences over the prior art.

(F) *The Rueckert Patent*

■ B & L also asserts the Rueckert U.S. Patent No. 3,796,361 ("Rueckert patent") as prior art against the LaBarre patent. The paper folding machine described in the Rueckert patent does not depend on the same repeatability and accuracy as required in the X–Y plotters claimed in Yeiser and LaBarre. Because paper folding machines do not operate bi-directionally with an emphasis on accuracy and repeatability, Lloyd, never once referred to or considered these machines in his own work designing plotters and recorders. *TR. Vol. 15–2309* (Lloyd). The Rueckert Patent does not constitute prior art as against the LaBarre patent.

In addition, the Court finds that its teachings do not render the LaBarre patent obvious. The Rueckert patent does not suggest a combination with Yeiser. The Rueckert patent does not disclose drive wheels with raised spots of random height. Rather the patent discloses the use of a roller with cavities or holes extending into the drive shaft. The use of the depressions is meant to improve friction, and not to create the indentation making and mating means of LaBarre.

(G) *Secondary Considerations*

The importance of improving the paper driving mechanism of the X–Y plotters is underscored by the direct request of Bill Hewlett. In attempting to solve the problems with the existing plotter, Mr. LaBarre experimented with several methods before hitting upon the use of grit to drive the paper. It wasn't until 1975 that Mr. LaBarre made his breakthrough.

Other companies had unsuccessfully attempted to improve the design of X–Y plotters. The LDC plotter was one such attempt. Mr. Lloyd testified that at Versatec his own design for the Matrix 600 plotter using a knurled drive system performed "at best ... in a mediocre way. It quite often would not meet its own specs." *TR. Vol. 14–2091* (Lloyd).

Lloyd first learned of the LaBarre invention when one of his co-workers at Versatec returned from a trade show and de-

scribed the drive system invented by La-Barre to a group of fellow engineers. "[I]t was our impression that someone had finally solved the problem of how to move paper accurately." *TR. Vol. 15–2441* (Lloyd).

The Houston Instrument's DMP–40 originally used knurls, but eventually changed to the use of grit.

In addition, others in the field of paper moving devices expressed skepticism as to the feasibility of the LaBarre technique. Houston Instrument's engineers had reservations on the reliability of the tracking of the paper, *HP Ex. 377* (Dep. Tr. of Jim Parnell), and engineer John Venthem doubted the grit drive wheels could move large E–size paper. *HP Ex. 382* (Venthem Dep. Tr. 191–93).

Finally, the grit wheel plotters enjoyed significant commercial success.

## III. CONCLUSIONS OF LAW

### (A) *Jurisdiction And Venue*

This Court has jurisdiction over the parties and of the subject matter of this action pursuant to 28 U.S.C. § 1338. Venue properly lies in the Northern District of California pursuant to 28 U.S.C. § 1400(b).

### (B) *Burdens Of Proof And Presumptions*

HP must prove the infringement of the LaBarre patent by a preponderance of the evidence. *Rite–Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1123 (Fed.Cir.1987). The parties have stipulated to the infringement of the LaBarre patent by B & L if the patent is proven valid.

A patent and each of its claims is presumed valid and the burden of establishing invalidity rests on the party asserting such invalidity. 35 U.S.C. § 282. The factual findings underlying a conclusion of invalidity must be proven by clear and convincing evidence. *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1151 (Fed.Cir. 1987).

■ The presumption of validity is premised on the expertise possessed by the Patent and Trademark Office in interpreting the references and having familiarity with the level of ordinary skill in the art. *Bausch & Lomb, Inc. v. BarnesHind/Hydrocurve, Inc.*, 796 F.2d 443, 447 (Fed.Cir. 1986) *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). The deference accorded to the PTO's expertise is heightened where, as here, the principal prior art reference, the Yeiser '950 patent, was considered during the examination of the application. *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1560 (Fed.Cir.), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

B & L contends that the LaBarre patent is invalid 1) as obvious under § 103, and 2) for failing to disclose the best mode under § 112.

### (C) *Best Mode Defense*

■ The best mode requirement derives from § 112 which provides that the specification of a patent "... shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. The purpose of the best mode requirement is to ensure that the public, in exchange for the rights given the inventor under the patent laws, obtains from the inventor a disclosure of the preferred embodiment of the invention. *Dana Corp. v. IPC Limited Partnership*, 860 F.2d 415, 418 (Fed.Cir.1988).

Because the Court must look into the mind of the inventor, there is "no objective standard by which to judge the adequacy of a best mode disclosure." *Spectra–Physics Inc. v. Coherent*, 827 F.2d 1524, 1535 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). The Court must determine what facts were available to the inventor at the time of filing the patent application, and importantly, consider evidence of "concealment." *Id.* at 1535.

*Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, set forth the concerns repeatedly expressed by the courts in reviewing the best mode disclosures of a patent:

> [T]he courts have not required the mode disclosed by the inventor be in fact the

optimum mode of carrying out the invention ... Even if there is a better method, the failure to disclose it will not invalidate the patent if the inventor does not know of it or does not appreciate that it is the best method ... Instead the thrust of decisions in this area has been to require that the inventor act in good faith with no attempt to conceal what he feels is the best method of using the invention.

616 F.2d 1315, 1340 (5th Cir.1980) (cites omitted).

B & L argues that the best mode for practicing the LaBarre invention is the use of directly adhered grit as used in the commercial manufacture of the X–Y plotter. Obviously, the San Diego division considered the directly adhered grit to be the best mode for the commercial production of the plotter. However, the question before the Court is whether Mr. LaBarre held that same belief. Before the San Diego division employed the method, Mr. LaBarre had experimented with embedding grit in an epoxy coated wheel. However, while this was the first method used by Mr. LaBarre, he abandoned this method once he began using sandpaper. Mr. LaBarre repeatedly testified that sandpaper performed superior to directly applied grit. After evaluating Mr. LaBarre's testimony, his credibility, the enthusiasm he expressed when describing the improved performance of sandpaper, his demeanor when cross-examined and his repeated assertions as to the best mode, the Court finds that Mr. LaBarre disclosed the best mode contemplated by him at the time of filing the patent.

Mr. LaBarre's general belief that the production facilities in San Diego (or Andover) would find a better and more economical method of producing his invention does not undermine his own good faith belief in the particular superiority of sandpaper over directly applied grit. In addition, the Court finds that Mr. LaBarre was truthful when he testified that he did not know the San Diego lab was using directly applied grit until after the patent filing date.

The Court finds that the LaBarre patent disclosed the best mode contemplated by the inventor as required under § 112.

### (D) *Obviousness*

█ B & L contests the presumptive validity of the patent on the grounds that the invention was obvious from the prior art. The legal determination of obviousness must be based on the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), namely:

(1) the scope and content of the prior art;

(2) the difference between the prior art and the claims at issue;

(3) the level of ordinary skill in the art; and

(4) objective evidence of secondary considerations.

Hindsight reconstruction of the subject matter claimed in the patent at issue is irrelevant to the issue of obviousness. Obviousness is to be judged at the time of the filing of the patent and from the perspective of a person "having ordinary skill in the art."

### 1. *The scope and content of the prior art*

The scope of the prior art is that art which is reasonably pertinent to the particular problem with which the inventor was involved. *In re Deminski*, 796 F.2d 436 (Fed.Cir.1986) B & L asserted the Yeiser patent and the Rueckert patent as prior art.

The Yeiser patent is within the scope of relevant art in the field of paper moving. However, as discussed above, Yeiser does not disclose the use of springs to create sufficient pressure on the drive wheels so as to indent the paper. In addition, Yeiser does not suggest an "indentation making and mating means" which would create a gearing effect to drive the paper. Instead, Yeiser simply suggests using friction to move the paper and suggests improving friction, "by knurling, or by a layer of rubber, or the like." Yeiser's recommendation to improve friction by the two named means or by "the like" begs the question

answered by LaBarre—how to improve the accuracy of the paper movement.

The Rueckert patent does not fall precisely within the field of X–Y plotters.

### 2. Level Of Ordinary Skill In The Art

A person of ordinary skill in the relevant art at the time of filing of the LaBarre '298 patent would have had at least five to ten years experience designing plotters and/or recorders. These people could include engineers with a B.S. degree, or technicians without degrees, but with considerable experience in paper moving techniques. B & L correctly notes that a person of ordinary skill would have had an understanding of the concept of friction.

B & L insists that one skilled in the art of paper handling, in the context of recorders, plotter and printers would have interpreted the Yeiser '950 patent to include spring biasing of three to ten pounds. The application of force in this range would indent the knurled pattern on the paper and create the desired gearing effect taught by LaBarre.

B & L fails to appreciate the fact that no one knew to apply the force necessary to create the positive drive system until after the LaBarre patent. Mr. Yeiser himself, who would qualify as one skilled in the art, could not build a successful X–Y plotter. The interpretation that B & L suggests eluded the industry. This is explained, perhaps, by the distinction made, by the ordinary skilled technician in the industry, between friction and positive drive systems.

### 3. Difference Between The Prior Art and The Claims At Issue

In spite of the excellent advocacy of B & L's attorneys, the Court is unable to read the existence of spring biasing, the indentation making and mating means and the use of grit into the Yeiser patent. These differences distinguish the LaBarre patent from the Yeiser patent. The practice of the LaBarre patent represents a significant advance in the industry of paper moving techniques. The differences between the LaBarre patent and the Yeiser patent are significant and patentable.

### 4. Secondary Considerations

The Court has examined secondary considerations of commercial success, long felt but unsolved needs, and skepticism and failure of others. These secondary considerations buttress the Court's finding that the LaBarre patent was a technological advance in the art. The simplicity of the invention should not belie the fact that others, including Yeiser, had failed to devise a method for accurately moving paper without the use of sprockets and perforated holes. The LaBarre invention eliminated the need for specially designed paper to feed through an X–Y plotter and additionally removed the complicated gantry system that had previously been employed. By simplifying the process, HP increased the speed capabilities of the X–Y plotters.

The Graham findings all support the legal determination that the LaBarre claims were not obvious at the time of filing for the patent. B & L has failed to rebut the presumption of validity afforded patents with clear and convincing evidence of obviousness.

### (E) Infringement

B & L admits for itself and no one else that Houston Instrument's moving paper X–Y plotters with the tungsten carbide plasma spray infringe claim 1 of the LaBarre patent.

### (F) Induced Infringement

In September 1985, B & L sold its Houston Instrument division to Ametek, Inc. ("Ametek"). HP asserts that B & L induced infringement of the LaBarre patent by Ametek through the following acts:

(i) B & L's agreement to indemnify Ametek for any damages recovered for infringement of the LaBarre patent up to a cap of $4.6 million; and

(ii) B & L's grant to Ametek of a license under the Yeiser reissue patent No. Re 31, 684.

B & L concedes that these terms are found in its agreements with Ametek respecting the sale of Houston Instrument,

but it denies that they establish HP's claim of inducing infringement.

Because B & L has not made, used or sold any moving paper X–Y plotters since the time it divested itself of Houston Instrument in October 1985, B & L cannot be liable as a direct infringer of the LaBarre patent after the date of divestiture.

Under 35 U.S.C. § 271(b), whoever actively induces infringement of a patent shall be liable as an infringer. Liability for inducement under section 271(b) is dependent on a showing that the conduct being induced constitutes direct infringement. *Stukenborg v. Teledyne, Inc.,* 441 F.2d 1069, 1072 (9th Cir.), *cert. denied,* 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92 (1971).

The mere act of entering into an indemnification agreement without more, does not amount to inducement of infringement. *Erie Technological Products, Inc. v. Die Craft Metal Products, Inc.,* 318 F.Supp. 933, 952 (N.D.Ill. 1970).

HP failed to meet its burden that B & L acted in a manner knowingly calculated to induce Ametek to infringe the LaBarre patent. In support of its claim for inducement, HP expends a good deal of adversarial energy denouncing B & L's behavior in prosecution of the Yeiser reissue patent. That question, while relevant to the related case 84–20642 RPA, does not go towards showing B & L actively induced infringement by Ametek.

(G) *Compliance With The Patent Marking Statute*

The Court will take up the issue of whether or not HP complied with the patent marking statute during the damage phase of this trial.

## IV. SUMMARY

The Court finds that the LaBarre patent is valid. Mr. LaBarre disclosed the best mode contemplated by him when he filed the patent application. In addition, the prior art references asserted by Bausch and Lomb do not render the LaBarre invention obvious. Bausch and Lomb has failed to meet its burden of proving the invalidity of the LaBarre patent by clear and convincing evidence.

Hewlett–Packard has failed to show that Bausch and Lomb induced Ametek to infringe the LaBarre patent.

The Court will take up the issue of compliance with the patent marking statute during the damage phase of this trial.

The parties are ordered to appear for a trial setting conference on September 29, 1989 at 10:30 a.m.

IT IS SO ORDERED.